TRACY L. WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
KELLYE NG-McCULLOUGH (Cal. Bar No. 313051)
Assistant United States Attorney
General Crimes Section
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-8408
     Facsimile: (213) 894-0141
     E-mail:    Kellye.Ng-McCullough@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                  UNITED STATES DISTRICT COURT

              FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 95-165-CBM |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A) |
| v. | |
| HOWARD BROOMFIELD, | |
| Defendant. | |

     Plaintiff United States of America, by and through its counsel
of record, the United States Attorney's Office for the Central
District of California and Assistant United States Attorney Kellye
Ng-McCullough, hereby files this opposition to defendant's motion to
reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).  The
government asks this Court to deny defendant's motion.

//

//

1    This Opposition is based upon the attached memorandum of points

2 and authorities, the files and records in this case, and such further

3 evidence and argument as the Court may permit.

4  Dated: May 5, 2021                 Respectfully submitted,

5                                     TRACY L. WILKISON
                                      Acting United States Attorney
6
                                      BRANDON D. FOX
7                                     Assistant United States Attorney
                                      Chief, Criminal Division
8

9                                     _____/s/_____
                                      KELLYE NG-McCULLOUGH
10                                    Assistant United States Attorney

11                                    Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                      PAGE

I.   INTRODUCTION................................................1

II.  STATEMENT OF FACTS..........................................2

     A.   Offense Conduct........................................2

     B.   Defendant's Sentence...................................6

     C.   Defendant's Criminal History...........................8

     D.   Incarceration..........................................8

III. LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE...................9

     A.   The Requirements Of The Statute........................9

IV.  ARGUMENT...................................................13

     A.   Defendant Has Failed to Demonstrate That He is
          Eligible For Release..................................13

          1.   The length of a sentence is not a basis for
               relief...........................................13

          2.   Defendants' sentencing differences are proper......17

          3.   Rehabilitation is not a basis for relief...........18

          4.   Defendant is not medically eligible for
               compassionate release............................19

     B.   Even If Defendant Were Otherwise Eligible, the 18
          U.S.C. § 3553(a) Factors Do Not Support a Shorter
          Sentence..............................................20

          1.   Defendant has not established that he is not a
               danger to the community..........................21

          2.   The other § 3553(a) factors also weigh against
               release..........................................23

V.   CONCLUSION.................................................24

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                                    PAGE

**CASES**

Dillon v. United States,
        560 U.S. 817 (2010)..............................................................9

Parker Drilling Mgmt. Servs., Ltd. v. Newton,
        139 S. Ct. 1881 (2019).........................................................16

United States v. Anchondo,
        No. CR 2:89-00874-TJH-2,
        2020 WL 6821326 (C.D. Cal. Jan. 31, 2020)......................13

United States v. Applewhite,
        No. 08-CR-60037,
        2020 WL 137452 (D. Or. Jan. 13, 2020)....................21, 22

United States v. Aruda,
        ---F.3d---, 2021 WL 1307884 (9th Cir. Apr. 8, 2021)...........10

United States v. Baeza-Vargas,
        2021 WL 1250349, at *2-3 (D. Ariz. Apr. 5, 2021)..............20

United States v. Broomfield,
        172 F. App'x 743,
        No. 05-55066, 2006 WL 529649, at *1 (9th Cir. 2006)............7

United States v. Broomfield,
        No. 96-50349, 1998 WL 551971, at *1 (9th Cir. Aug. 27,
        1998)............................................................7

United States v. Carpenter,
        914 F.2d 1131, 1135-36 (9th Cir. 1990).........................17

United States v. Chambliss,
        948 F.3d 691, 693-94 (5th Cir. 2020)...........................12

United States v. Dancy,
        EDCR 19-101-PA, ECF No. 76, at 4 (C.D. Cal. August 18,
        2020)..........................................................21

United States v. Ebbers,
        --- F. Supp. 3d. ---,
        2020 WL 91399 (S.D.N.Y. Jan. 8, 2020).........................12

United States v. Gotti,
        No. 02-CR-743,
        2020 WL 497987 (S.D.N.Y. 2020)................................21

United States v. Greenhut,
        No. 18-CR-48-CAS,
        2020 WL 509385 (C.D. Cal. Jan. 31, 2020).....................10

iv

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                          <u>PAGE</u>

<u>United States v. Gunn</u>,
       980 F.3d 1178, 1180 (7th Cir. 2020).............................11

<u>United States v. Hamilton</u>,
       715 F.3d 328 (11th Cir. 2013).................................10

<u>United States v. Hernandez</u>,
       EDCR 13-00122-VAP, ECF No. 121, at 7 (C.D. Cal. Aug. 19,
       2020).........................................................12

<u>United States v. Hoy</u>,
       932 F.2d 1343, 1345 (9th Cir.1991)............................17

<u>United States v. Kelley</u>,
       962 F.3d 470, 477 (9th Cir. 2020).............................11

<u>United States v. McBride</u>,
       2021 WL 354129, at *3 (W.D.N.C. Feb. 2, 2021).................20

<u>United States v. McGrue</u>,
       No. 08-CR-01318-ODW-1,
       2020 WL 4042777, at *1 (C.D. Cal. Jul. 10, 2020)..............9

<u>United States v. Moreno</u>,
       869 F.3d 942, 956 (9th Cir. 2017).............................10

<u>United States v. Parker</u>,
       461 F. Supp. 3d 966, 981 (C.D. Cal. 2020)....................13

<u>United States v. Perez</u>,
       962 F.3d 420, 455 (9th Cir. 2020).............................18

<u>United States v. Rivernider</u>,
       2019 WL 3816671, at *2 (D. Conn. 2019)........................11

<u>United States v. Rodriguez-Ramirez</u>,
       No. CR 2:99-01274-RSWL-19,
       2017 WL 3449051, at *4 (C.D. Cal. Aug. 11, 2017).............17

<u>United States v. Ruffin</u>,
       978 F.3d 1000 (6th Cir. 2020).................................12

<u>United States v. Tomes</u>,
       --- F.3d ---, 2021 WL 868555 (6th Cir. 2021).................16

<u>United States v. Urso</u>,
       No. 03-CR-1382,
       2019 WL 5423431 (E.D.N.Y. Oct. 23, 2019).....................21

<u>United States v. Vera</u>, 588 F. App'x 534, 537 (9th Cir. 2014).......17

# TABLE OF AUTHORITIES

DESCRIPTION                                                                PAGE

United States v. Voris,
    964 F.3d 864 (9th Cir. 2020)...................................15

**STATUTES**

18 U.S.C. § 3142.........................................................25, 27

18 U.S.C. § 3553.......................................................passim

18 U.S.C. § 3582(c)....................................................passim

21 U.S.C. § 841(a)..........................................................7

21 U.S.C. § 841(d)..........................................................7

21 U.S.C. § 846.............................................................7

21 U.S.C. § 848........................................................passim

28 U.S.C. § 2255...........................................................18

28 U.S.C. § 994(t).........................................................26

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.   INTRODUCTION**

3         In the past year, district courts around the nation have ruled

4    on an unprecedented number of motions filed by defendant prisoners

5    seeking reductions in their sentences under 18 U.S.C. §

6    3582(c)(1)(A).  This increase in the number of motions is the result

7    of Congress's decision in the First Step Act to allow defendants to

8    directly file compassionate release motions in district court.  Many

9    prisoners seek compassionate release based on a risk of severe

10   illness from COVID-19.  Other prisoners seek a reduced sentence and

11   release because the sentence they are serving would have been

12   completed if they had not been sentenced under a then-mandatory

13   sentencing regime and for which the laws have now changed.  Defendant

14   is not one of these prisoners.

15        Defendant's motion for compassionate release does not raise any

16   health or COVID-related issues or argue that changes in the law

17   subsequent to his sentencing create inequity.  Instead, he argues

18   that his sentence for organizing a substantial PCP manufacturing and

19   distribution scheme should be reduced because he received a mandatory

20   life sentence under 21 U.S.C. § 848, which, he contends, is unusually

21   long.  He asserts that he would have served the sentence he would

22   have received today, assuming a low-end 360-month sentence.  Further,

23   he argues that the difference in sentencing between defendant and co-

24   defendants is inequitable.  Lastly, defendant claims his efforts

25   toward significant rehabilitation constitute an extraordinary and

26   compelling reason, in combination with other factors.

27        Defendant's compassionate-release motion must be denied for five

28   reasons.  <u>First</u>, defendant has not met his burden in establishing

that the length of his mandatory life sentence is an "extraordinary
and compelling" reason warranting release.  That the statute
defendant was convicted on has not been charged in other cases in
recent years is not a basis for release.  Second, defendant's role as
a leader and organizer of a large-scale drug operation distinguishes
him from co-defendants who have been released from custody.  Third,
while defendant's rehabilitation efforts are laudable, they do not
constitute an extraordinary and compelling reason justifying release.
Fourth, defendant's request for extraordinary leniency is
particularly weak where he does not cite any significant health
concerns that put him at a heightened risk for severe illness from a
COVID-19 infection.[1]  Lastly, defendant has not established that the
balance of the factors under 18 U.S.C. § 3553(a) weigh in defendant's
favor.

## II.   STATEMENT OF FACTS

### A.   Offense Conduct

Defendant was the overall leader and organizer of a substantial
PCP operation and supervised the actions of all co-defendants
involved in the manufacture and sale of PCP.  (Presentence
Investigation Report ("PSR") ¶ 80.)  In August 1991, defendant and
his brother directed an unindicted co-conspirator and a cooperating
individual ("CI") to purchase chemicals used in the manufacture of
PCP[2] from a chemical supply house in Oakland, California.  (Id. ¶

___

[1] Moreover, the Bureau of Prisons has started its vaccination
program, which weighs against the need for a permanent reduction in
defendant's sentence, especially where, like here, defendant has
refused the vaccine.

[2] PCP is a dissociative anesthetic, use of which begets
dangerous side effects.  See Partnership to End Addiction, PCP
(Phencyclidine), https://drugfree.org/drugs/pcp/ (last visited April
*(footnote cont'd on next page)*

2

34.)  At or around the same time, the unindicted co-conspirator and CI travelled from Los Angeles to Oakland and obtained approximately 4 kilograms of ruthenium, a chemical used in the manufacture of PCP, from a chemical supply business in Oakland.  (Id. ¶ 35.)

In January 1994, ATF agents and the Los Angeles Police Department executed 18 search warrants as part of an investigation into PCP trafficking in Los Angeles, including at defendant's home in West Covina.  (Id. ¶¶ 36, 39.)  During the search at defendant's West Covina home, agents seized: an SWD M-11 submachine gun, 9 mm; Mauser bolt action rifle; Remington 270 caliber rifle; Intratec 9 mm pistol; Smith and Wesson 44 magnum revolver; Davis 22 caliber pistol; Egyptian 9 mm pistol; an "unknown amount of corresponding ammunition"; $4,000 cash; a computer disk with a recipe for the manufacturing of PCP; and a handwritten recipe for the manufacturing of PCP.  (Id. ¶ 9.)

Based in part on evidence seized from the execution of the January 1994 search warrant, the ATF and the LAPD began actively investigating defendant and his brother for manufacturing PCP.  (Id. ¶ 43.)

In September 1994, defendant and his brother called the CI and directed him to travel to Barstow, California, to pick up another co-defendant whose car had broken down while carrying 2.5 gallons of PCP and other precursor chemicals. (Id. ¶ 44.)  The CI picked up the co-defendant and returned to meet defendant in Los Angeles with the PCP

---

29, 2021).  "At high doses, PCP can cause hallucinations as well as seizures, coma, and death (though death more often results from accidental injury or suicide during PCP intoxication)."  (Id.)  When detained or in hospital, PCP users "often become violent or suicidal, and are very dangerous to themselves and to others."  (Id.)

and chemicals.  (Id.)  The CI was paid three ounces of PCP for his assistance.  (Id.)

In October 1994, the CI met with defendant at the Broomfield family residence, where defendant informed the CI that he was "putting something together," which the CI understood to mean preparing the manufacture of PCP.  (Id. ¶ 46.)  On November 2, 1994, defendant directed the CI to purchase hydrogen tanks at a welding supply house and deliver it to his residence. (Id.)  On November 8, 1994, defendant and his brother provided the CI with a Mazda van and told him to meet them at a Las Vegas casino. (Id. ¶ 49.)  The following day, defendant directed the CI to enter a storage facility in Las Vegas to retrieve items in a van inside of a storage unit. (Id.)  Later that day, agents saw within the Mazda van two cans labeled pyridine.[3]  (Id.)  That same day, defendant's brother and a co-defendant were videotaped pouring the pyridine out of the metal cans and into glass jars.  (Id. ¶ 50.)

In November 1994, defendant contacted the CI several times and left two notes asking the CI to contact him because he needed help that night.  (Id. ¶ 51.)  Later that evening, defendant picked up the CI and met with other co-defendants.  (Id. ¶ 51-52.)  Defendant instructed the CI to drive a pickup truck and placed a box of gas cans in the truck. (Id. ¶ 52.)

In December 1994, the CI met with defendant, where the CI was given money and a list of chemicals to buy.  (Id. ¶ 55.)  "He was told what store (chemical supply house) to go to first," left to

---

[3] Hydrogen, combined with pyridine, under pressure, will produce piperidine, the necessary precursor chemical used in the production of the PCP.  (PSR § 47.)

4

Oakland, and on the way, purchased 1 kilogram of ruthenium and 6 gallons of pyridine from two separate supply houses. (Id.)   Later that evening, the defendant and other co-defendants came to the CI's home and transferred the pyridine into glass jars. (Id.)

In January 1995, defendant provided the CI with money and a list of chemicals to purchase in Oakland, which included 5 gallons of bromobenzene, 6 pounds of hydrochloric acid, and 5 gallons of cyclohexanone.  (Id. ¶¶ 58-59.)   The CI purchased every item on the list except for cyclohexanone because the last supply house informed the CI that the purchase would be considered "suspicious" in combination with the other chemicals purchased.  (Id. ¶ 58.)

In February 1995, defendant sent the CI to Oakland to buy more chemicals.  (Id. ¶ 62.)   Once again, defendant gave the CI money and a shopping list.  (Id.)   The CI purchased 10 gallons of ethyl ether; 5 gallons of cyclohexanone, one half pint bottle of hydrochloric acid; 10 gallons of petroleum ether; and 50 pounds of sodium metabisulfite. (Id.)

On February 17, 1995, defendant and co-defendants loaded the CI's car with chemicals at a garage on Palmer Street, and defendant informed the CI that they would be bringing back "juice," a street term for finished PCP.  (Id. ¶ 65.)   ATF, DEA, and LAPD officers initiated surveillance of defendant and his brother after they left the Palmer Street garage in a van and travelled to an oil field. (Id. ¶ 66.)   As the van came closer to law enforcement surveillance units, the driver sped off.  (Id.)   After a brief pursuit, the DEA arrested defendant and his brother.  (Id.)

After the defendant's arrest, law enforcement approached the lab site in the oil fields where co-defendants attempted to flee.  (Id. ¶

67.)  DEA agents and chemists seized from the lab site 9.7 kilograms of pure PCP and 9.5 kilograms of PCC.  (Id. ¶ 68.)  According to the DEA chemist, the 9.5 kilograms of PCC had the potential to be converted to six kilograms of PCP at this lab.  (Id. ¶ 69.) Therefore, the total potential yield of pure PCP was 15.7 kilograms, which could produce 36 gallons of liquid street PCP.  (Id.) According to the DEA case agent, each gallon of PCP could be sold in Los Angeles between $5,000 to $8,000, which translated to a total value of $180,000 to $288,000.  (Id. ¶ 70.)  The east coast value was higher, where a gallon could be sold for $15,000 to $20,000, translating to a total value of $540,000 to $720,000.  (Id.)

In September 1995, a cooperating witness told agents that during 1993, he purchased one to two gallons of PCP a week from defendant and his brother, approximately 52 gallons total.  (Id. ¶ 78.)  The cooperating witness explained that he would contact defendant and several co-defendants if he wanted PCP.  (Id.)  Defendant and his brother would not directly hand the cooperating witness the PCP, but used runners to make the deliveries. (Id.)  Later that month, another cooperating witness told law enforcement that he purchased one gallon of piperidine from defendant and his brother in October 1993, and two gallons of piperidine in January 1995. (Id. ¶ 79.)  During these transactions, the cooperating witness would always give the money for the piperidine to defendant.  (Id.)

### B.  Defendant's Sentence

Defendant was convicted at trial by a jury in February 1996, for conspiracy to manufacture PCP in violation of 21 U.S.C. § 846; manufacturing, distributing and possession with the intent to distribute PCP in violation of 21 U.S.C. § 841(a)(1); possession of a

1    listed chemical with the intent to manufacture a controlled substance

2    in violation of 21 U.S.C. § 841(d)(1); and a continuing criminal

3    enterprise in violation of 21 U.S.C. § 848.

4        Defendant's total offense level was 42.[4]  (ECF No. 863 at 198.)

5    The PSR noted:

6        [T]he defendant was the principal administrator, organizer
         and leader of the instant offense.  Further, the conspiracy
7        involved 375,345 kilograms of marijuana (conversion amount)
         which is more than 300 times the 100 kilograms marijuana
8        described in 21 U.S.C. § 841(b)(1)(B).  Therefore,
         according to 21 U.S.C. § 848(b), the defendant appears to
9        meet the requirement for a mandatory life sentence.

10   PSR § 159 (emphasis in original).

11       The Court determined defendant's criminal history category was

12   IV.  (Id.)  In June 1996, defendant was sentenced to 360 months on

13   Counts 2 through 4 (21 U.S.C. §§ 841(a)(1), 841(a)(1)(A); 18 U.S.C. §

14   2(a)), 30 years on Count 11 (21 U.S.C. § 841(a)(1)), 10 years on

15   Counts 5 through 10 (21 U.S.C. §§ 841(d)(1), 841(d)(2); 18 U.S.C. §

16   2(a)) and life on Count 12 (21 U.S.C. 848, continuing criminal

17   enterprise), to be served concurrently.  (Id. at 196-98.)

18       Defendant appealed.  United States v. Broomfield, No. 96-50349,

19   1998 WL 551971, at *1 (9th Cir. Aug. 27, 1998).  Defendant's

20   conviction was affirmed in August 1998.  Defendant filed a post-

21   conviction collateral attack in January 2000.  This Court granted the

22   motion.  The Ninth Circuit reversed that decision in March 2006.

23   United States v. Broomfield, 172 F. App'x 743, No. 05-55066, 2006 WL

24   529649, at *1 (9th Cir. 2006).  Defendant unsuccessfully sought to

25

26   ─────────────

27       [4] The Court did not adopt the PSR's two-level enhancement based
     on defendant's January 1994 felon in possession conviction, citing a
     lack of connection with the instant drug offenses.  (ECF No. 863 at
28   198.)  However, the Court found that 3 criminal history points should
     be added, resulting in a criminal history category of IV.  (Id.)

                                    7

1    modify his sentence on prior occasions.  (ECF Nos. 700; 796; 800;
2    850.)

3         **C.   Defendant's Criminal History**

4         In 1980, defendant was convicted of armed robbery, in violation
5    of California Penal Code § 211, with a firearm enhancement under
6    California Penal Code § 12022(A).  (PSR § 108.)  Defendant was
7    committed to the California Youth Authority for two years, with an
8    additional year for the firearm enhancement.  (Id.)

9         In 1985, defendant was convicted of possession of PCP for sale,
10   in violation of California Health and Safety Code § 11378.5.  (Id. ¶
11   113.)  He was sentenced to three years' probation.  (Id.)  In June
12   1988, defendant was convicted for driving with a suspended license, a
13   misdemeanor in violation of California Vehicle Code § 14601(A), and
14   driving at an unsafe speed, an infraction in violation of California
15   Vehicle Code § 22350.  (Id. ¶ 117.)

16        In January 1996, defendant was convicted of felon in possession
17   of a firearm, in violation of 18 U.S.C. § 922(g)(1).  He was
18   sentenced to 100 months' imprisonment, to be served concurrently with
19   his sentence for the PCP-related charges.  (Id. ¶ 120.)

20        **D.   Incarceration**

21        Defendant is currently serving his life sentence at Federal
22   Correctional Institution – Victorville ("FCI Victorville").  He has
23   served over 26 years of his lifetime sentence.  (See Inmate Data, Ex.
24   A at 4.)

25        Defendant filed a request for compassionate release to the
26   Federal Bureau of Prisons and the FCI-Victorville Warden on December
27   12, 2019.  (ECF No. 863 at 49-50.)  In December 2019, Warden Thahesha
28   Jusino denied the request.  (Id. at 52.)  On February 16, 2021,

1  counsel for defendant submitted a renewed request for compassionate
2  release under 18 U.S.C. § 3582(c)(1)(A).  (Id. at 54-58.)  On
3  February 19, 2021, Warden Jusino denied the request.  (Id. at 61-62.)

4      Now, before this Court, defendant renews his compassionate
5  release request based on the life sentence under 21 U.S.C. § 848 as
6  compared to the sentence he believes he would have received if
7  sentenced today under different charges, the fact that co-defendants
8  have been released from custody, and defendant's rehabilitation
9  efforts.

10 **III. LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE**

11     A compassionate-release motion is a request for a permanent
12 reduction in a defendant's federal sentence.  A district court
13 generally "may not modify a term of imprisonment once it has been
14 imposed."  18 U.S.C. § 3582(c); see Dillon v. United States, 560 U.S.
15 817, 824-25 (2010).  Compassionate release is one of the few
16 exceptions to this rule, allowing a court to "reduce the term of
17 imprisonment (and . . . impose a term of probation or supervised
18 release with or without conditions that does not exceed the unserved
19 portion of the original term of imprisonment)[.]"  18 U.S.C.
20 § 3582(c)(1).

21     **A.   The Requirements Of The Statute**

22     Because this relief is both drastic and permanent, it is subject
23 to strict statutory conditions.  Defendant bears the burden to prove
24 that he has met these requirements.  See United States v. McGrue, No.
25 08-CR-01318-ODW-1, 2020 WL 4042777, at *1 (C.D. Cal. Jul. 10, 2020)
26 (stating that under § 3582(c)(1)(A)(i) a defendant bears the burden
27 of establishing the existence of special circumstances permitting
28 release); United States v. Greenhut, No. 18-CR-48-CAS, 2020 WL

509385, at *1 (C.D. Cal. Jan. 31, 2020) (citing United v. States v. Sprague, 135 F.3d 1301, 1306-07 (9th Cir. 1998) and stating that defendant bears the burden of establishing entitlement to sentencing reduction)); United States v. Hamilton, 715 F.3d 328, 337 (11th Cir. 2013) ("defendant, as the § 3582(c)(2) movant, bears the burden of establishing" eligibility).

First, a district court can evaluate a defendant's request for compassionate release only "after the defendant has fully exhausted all administrative rights" before the BOP.  The government agrees that defendant has met this requirement.

Second, in evaluating compassionate-release requests, courts must determine whether a defendant has presented an "extraordinary and compelling" reason for release. 18 U.S.C. § 3582(c)(1)(A)(i).[5] The statute does not define the scope of the "extraordinary and compelling" requirement, and district courts have discretion to determine which reasons are "extraordinary and compelling."  See United States v. Aruda, ---F.3d---, 2021 WL 1307884 (9th Cir. Apr. 8, 2021).  Nonetheless, the plain meaning of the term "extraordinary and compelling" establishes Congressional intent that only rare circumstances should qualify for release.  Section 3582 does not authorize a "plenary resentencing proceeding," let alone a re-litigation of facts or an override of prosecutorial discretion in charging decisions.  See United States v. Moreno, 869 F.3d 942, 956 (9th Cir. 2017) (citing Dillon); United States v. Kelley, 962 F.3d

---

[5] 18 U.S.C. § 3582(c)(1)(A)(ii) authorizes an alternative basis for release, but it does not apply to defendants who are less than 70 years old.

470, 477 (9th Cir. 2020) (the First Step Act "does not permit a plenary resentencing").

Similarly, the Sentencing Commission's statements in USSG § 1B1.13 may inform a district court's discretion for determining which reasons are § 3582(c)(1)(A) motions. <u>Aruda</u>, at *4.[6]  The government believes that it is appropriate for the Court to begin its analysis with § 1B1.13 because the definitions in it on what conditions constitute "extraordinary and compelling" reasons for release provide helpful guidance on this issue and minimize the possibility that similarly situated defendants will receive dramatically different sentences because their motions were heard by different judges.  See <u>United States v. Gunn</u>, 980 F.3d 1178, 1180 (7th Cir. 2020) (stating that the lack of a binding policy statement should not create "a sort of Wild West in court, with every district judge having an idiosyncratic release policy."); <u>United States v. Parker</u>, No. 2:98-CR-00749-CAS-1, 2020 WL 2572525, at *8-9 (C.D. Cal. May 21, 2020) (finding that USSG § 1B1.13 is no longer limiting but considering the policy statement as guidance); <u>United States v. Rivernider</u>, 2019 WL 3816671, at *2 (D. Conn. 2019) (holding that the policy statement provides "helpful guidance"); <u>United States v. Ebbers</u>, 432 F. Supp. 3d 421, 430 (S.D.N.Y. 2020) (expressing concern

_____

[6] The government's previous position in such motions was that USSG § 1B1.13 contains binding requirements that defendants must meet for release.  The government respectfully still believes that the line of authority holding otherwise is mistaken, in part because it is not reasonable to think that Congress would have made a dramatic change in the finality of all sentencing decisions without doing so directly.  See <u>BNSF Ry. v. Cal. Dep't of Tax</u>, 904 F.3d 755, 766 (9th Cir. 2018) (quoting Supreme Court precedent and stating that there is a "'strong presumption' that repeals by implication are 'disfavored' and that 'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute").  Nonetheless, <u>Aruda</u> is now the law on this matter.

1   that an expansive application of compassionate release would yield

2   significant sentencing disparities).

3       As the government explains below, defendant does not meet any of

4   the criteria in § 1B1.13 for release and, more generally, has not

5   presented an adequate basis for this Court to determine that an

6   "extraordinary and compelling" basis for release exists.

7       Third, § 3583(c)(1)(A) requires the Court to consider the

8   "factors set forth in section 3553(a) to the extent that they are

9   applicable." Even if the other requirements are met, courts should

10  deny a motion for release if the defendant does not establish that

11  the balance of the applicable § 3553(a) factors weigh in favor of

12  release. "This last [§ 3553(a)] requirement confirms an overarching

13  point: The district court has substantial discretion. The statute

14  says that the district court 'may' reduce a sentence if it finds the

15  first two requirements met; it does not say that the district court

16  must do so." United States v. Ruffin, 978 F.3d 1000, 1005 (6th Cir.

17  2020). See also United States v. Chambliss, 948 F.3d 691, 693-94

18  (5th Cir. 2020) (district court did not abuse its discretion in

19  denying defendant's motion based on § 3553(a) balancing despite

20  diagnosis of terminal illness); United States v. Hernandez, EDCR 13-

21  00122-VAP, ECF No. 121, at 7 (C.D. Cal. Aug. 19, 2020) ("[A]lthough

22  Defendant met his burden to show he suffers from a qualifying medical

23  condition, the relevant 18 U.S.C. § 3553(a) factors weigh against

24  reducing his sentence").

25      As the government explains below, defendant has not met

26  his burden in establishing that the § 3553(a) factors weigh in favor

27  of release.

28

12

1  **IV.   ARGUMENT**

2         Defendant's claims must fail: he is not eligible for

3  compassionate release because he has not presented an extraordinary

4  and compelling reason for release and the 18 U.S.C. § 3553(a) factors

5  do not weigh in favor of release.

6         **A.   Defendant Has Failed to Demonstrate That He is Eligible For
              Release**

7

8              1.   <u>The length of a sentence is not a basis for relief</u>

9         Defendant asserts that his life sentence for a non-violent drug

10 offense was overly severe, thus warranting a sentence reduction.

11 While some courts have reduced a defendant's sentence due, in part,

12 to its length--including <u>United States v. Parker</u>, 461 F. Supp. 3d

13 966, 981 (C.D. Cal. 2020) (concluding that "the severity

14 of [defendant's] life sentence, imposed under a sentencing regime

15 that is no longer valid, coupled with his deteriorating health, which

16 may be further exacerbated by his incarceration during the COVID-19

17 pandemic, present 'extraordinary and compelling' circumstances that

18 justify a reduction in . . . sentence"), which defendant cites--other

19 courts have deemed arguments that lengthy sentences are

20 "extraordinary and compelling" reasons for relief as "misguided."

21 <u>United States v. Anchondo</u>, No. CR 2:89-00874-TJH-2, 2020 WL 6821326

22 (C.D. Cal. Jan. 31, 2020) (finding that neither being sentenced under

23 the then-mandatory Sentencing Guidelines, nor a sentence of life

24 imprisonment, nor thirty years of imprisonment served, nor appeals

25 that life sentence is "grossly disproportionate to the crimes

26 [defendant] committed" constitute a "extraordinary and compelling"

27 reason warranting a reduction; such arguments are "misguided").

28

The facts of this case--specifically, defendant's role--the nature of the offense conduct, and his personal characteristics do not support such consideration.  As a 32-year-old adult, defendant took an active role in manufacturing PCP after having been arrested for possession of PCP for sale in 1984.  (PSR ¶ 113.)  Defendant was well aware of the consequences of his actions, and instead of leading a law-abiding life, he opted to take on an even bigger role in the manufacture and sale of PCP.  Notably, defendant puts forth his children and family as grounds for relief, yet these same children did not sway defendant from his continuing criminal conduct.

Indeed, defendant exercised leadership in the instant offense, and had a relatively larger degree of participation and organization in the offense than his co-defendants.  (Id. ¶¶ 13, 27, 28, 34-39, 43-66, 78-80.)  Defendant's role in this crime--and others--cannot be downplayed.

Defendant argues that the United States Attorney's Office for the Central District of California has not filed a 21 U.S.C. § 848 charge against a defendant since 2012 as part of a larger trend of obsolescence.[7]  (ECF No. 863 at 17.)  The defendant further notes President Barack Obama's commutation of sentences for 26 individuals serving life sentences under § 848.  (Id. at 17-18.)  These arguments do not establish any "extraordinary and compelling" reason for this

_____

[7] Defendant further argues that if he were charged with a different drug distribution statute today, he would have already served his time.  (ECF No. 863 at 18.)  Defendant avers that with an application of an offense level of 42 and a criminal history category of IV, his low-end advisory sentence would be 360 months, a sentence he claims to have served accounting for good time credit.  (Id. at 10.)  This argument improperly assumes he would receive a low-end sentence despite his role as a leader and organizer in the drug manufacturing and distribution scheme and multiple other counts of conviction at trial, and should therefore be rejected.

14

defendant's release.  Unlike those other unrelated cases, defendant was charged and convicted at trial with § 848.  Also, unlike the 26 defendants that the President exercised his discretion to commute their sentence, the President did not do so as to this defendant.[8]

Defendant does not and cannot argue that an actual change in the law supports his release.  The statue for which defendant was convicted remains.  Yet, even a change in the law, let alone a prosecutorial office's later charging decisions and a President's clemency decisions as to other individuals, are not valid bases for compassionate release.  See generally United States v. Voris, 964 F.3d 864, 873 (9th Cir. 2020) (noting that Congress "expressly limited the retroactive application" of the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5222, § 403(b)).

Furthermore, taken to its logical extreme, defendant's position would wipe away core aspects of the modern federal sentencing system and turn § 3582(c)(1)(A) into a universal solvent that would eviscerate prosecutorial discretion in charging decisions and eliminate the practical effect of mandatory-minimum sentences, the limitations on post-conviction motions under 28 U.S.C. § 2255, the Sentencing Guidelines as a whole, and any explicit Congressional determinations that certain amendments to the Sentencing Guidelines are not retroactive.  While important and substantial, the changes in federal criminal law that Congress intended to implement in the First Step Act without question were meant to revise federal criminal law

---

[8] The President granted clemency to co-defendant Darnell Crookshank, who was released after serving 261 months on a life sentence.  (ECF No. 863 at 40, ¶ 33, 215.)  Mr. Crookshank received a life sentence under 21 U.S.C. §§ 841 and 846 (id. at 212), not under § 848, like defendant here.

15

1    rather than overthrow it.  See Parker Drilling Mgmt. Servs., Ltd. v.

2    Newton, 139 S. Ct. 1881, 1890 (2019) ("It is a commonplace of

3    statutory interpretation that 'Congress legislates against the

4    backdrop of existing law.'" (citations omitted)).  Notably, even in

5    passing the First Step Act, Congress did not alter the sentencing

6    framework for § 848.  There is simply no basis for defendant to

7    override the sentencing regime established in the statute, which

8    remains the same today as the day defendant was convicted at trial

9    and the day that defendant was sentenced.

10       For all of these reasons, this Court should hold that

11   defendant's life sentence under 21 U.S.C. § 848 does not present an

12   "extraordinary and compelling" reason for relief.  That conclusion

13   accords with the Sixth Circuit's decision in United States v. Tomes,

14   990 F.3d 500, 2021 WL 868555 (6th Cir. 2021).  There, the defendant

15   argued that he was entitled to relief because "if he were sentenced

16   today for the same crime, he would not have gotten the sentence he

17   did."  2021 WL 868555, at *4.  The reason was that the First Step Act

18   had lowered the mandatory minimum for one of his crimes.  See id.

19   The Sixth Circuit, however, held that this change in sentencing law

20   was not an "extraordinary and compelling" reason for release because

21   it was expressly non-retroactive and did not apply to the defendant's

22   case.  Id.

23       The First Step Act only applies retroactively to "covered

24   offenses" which means "a violation of a Federal criminal statute, the

25   statutory penalties for which were modified by section 2 or 3 of the

26   Fair Sentencing Act of 2010 (Public Law 111-220; 124 Stat. 2372) . .

27   . ."  (Id.)  Thus, defendant, who was convicted of conspiracy to

28   manufacture PCP; manufacturing, distribution and possession with the

16

intent to distribute PCP; and continuing criminal enterprise, cannot benefit from its provisions.

### 2. Defendants' sentencing differences are proper

Defendant argues that the sentencing differences between himself and other defendants present an extraordinary and compelling circumstance. "[A] disparity in sentencing among co-defendants is not, by itself, a sufficient ground for attacking an otherwise proper sentence under the guidelines." United States v. Hoy, 932 F.2d 1343, 1345 (9th Cir. 1991) (citing United States v. Carpenter, 914 F.2d 1131, 1135-36 (9th Cir. 1990)). Courts have therefore upheld such a disparity where the defendants bore varying levels of responsibility. United States v. Rodriguez-Ramirez, No. CR 2:99-01274-RSWL-19, 2017 WL 3449051, at *4 (C.D. Cal. Aug. 11, 2017), aff'd, 745 F. App'x 276 (9th Cir. 2018) (rejecting defendant's argument that denying him a sentence reduction would create unwarranted sentencing disparities between co-defendants); United States v. Vera, 588 F. App'x 534, 537 (9th Cir. 2014) (affirming no unreasonable disparity existed between defendant's 210-month sentence when compared to 120-, 51-, and 37-month sentences of his co-defendants where defendant had an aggravating role, had an enhancement for use of a minor, did not receive a reduction for accepting responsibility, and was not eligible for safety valve reduction).

Here, defendant is not similarly situated to his co-defendants because he exercised a leadership role in this offense. Over the course of approximately four years, defendant directed and provided money to co-defendants to travel to chemical supply houses and purchase the chemical ingredients to manufacture PCP. (PSR ¶¶ 12-39,

17

43-46, 55-64.)  Defendant further provided a CI with a van and directed him to retrieve materials related to PCP manufacturing from a storage unit in Las Vegas.  (Id. ¶ 49.)  Defendant was the overall leader and organizer of the PCP operation and supervised the actions of all co-defendants and others involved in the manufacture and sale of PCP.  (Id. ¶ 80.)  Defendant's higher sentence was justified.

Additionally, even without the mandatory nature of his sentence, it is within Guidelines.  Defendant argues he should get a low-end Guidelines sentence of 360 months, yet his Sentencing Guidelines range is 360-life.  Accordingly, it cannot be said now that his life sentence, which is within his applicable Guidelines range (even discounting the mandatory minimum sentence) creates an unwarranted sentencing disparity.  See United States v. Perez, 962 F.3d 420, 455 (9th Cir. 2020) (upholding life sentence, in part, where sentence imposed was within Guidelines range).

          3.    Rehabilitation is not a basis for relief

"[R]ehabilitation of the defendant is not, by itself, an extraordinary and compelling reason" supporting a reduction in sentence. U.S.S.G. § 1B1.13, cmt. (n.3).  As evidence of his rehabilitation, defendant points to his mentorship, completion of courses, and prison employment.  (ECF No. 863 at 21-25.)  Defendant is using his period of incarceration in a productive manner.  While such efforts are laudable, they remain insufficient to constitute an "extraordinary and compelling" reason for reduction in sentence on their own.

18

###### 4.   Defendant is not medically eligible for compassionate release

Defendant has failed to establish his eligibility for compassionate release.  Here, defendant is ineligible for compassionate release because he does not assert any qualifying age or health condition.

Defendant offers no case-specific facts establishing his eligibility for compassionate release under the criteria in USSG § 1B1.13.  Defendant is not, for example, terminally ill, or subject to a serious and unrecoverable condition that makes him unable to "provide self-care" within a BOP facility.  USSG § 1B1.13, comment. (n.1(A)(i)-(ii).  Further, as a 59-year-old, defendant does not satisfy the statute's age-related conditions.  Id., comment. (n.1(B)).  To the extent the defendant has been able to participate in prison life and classes, for instance, that suggests that he does not satisfy the USSG § 1B1.13 requirements.  Thus, defendant does not present an extraordinary and compelling reason to release him early from his sentence.

Defendant does not argue that the COVID-19 pandemic justifies release.  Even if he did, however, that is not a factor specific to defendant at all.  Additionally, he has been offered the COVID-19 vaccine, which could provide him 95% protection from the coronavirus, and declined it.  (Ex. B, Immunization Record.)

In the absence of a rational and CDC-recognized basis for refusing the vaccine (e.g., potential allergic reaction or pregnancy), a prisoner's voluntary refusal to accept effective medical care should not change the assessment that the prisoner can appropriately live and function while imprisoned.  See United States

1    v. Baeza-Vargas, 2021 WL 1250349, at *2-3 (D. Ariz. Apr. 5, 2021)

2    ("Judges of this Court, as well as others around the country, have

3    ruled with consistency that an inmate's denial of a COVID-19

4    vaccination weighs against a finding of extraordinary and compelling

5    circumstances."); United States v. McBride, 2021 WL 354129, at *3

6    (W.D.N.C. Feb. 2, 2021) (relief denied in part because the inmate

7    refused the vaccine; "Defendant's refusal to take preventative

8    measures undermines his assertion that extraordinary and compelling

9    reasons exist to warrant his release from prison").  Indeed, a

10   contrary determination by this Court would create perverse policy

11   incentives that would thwart the ability of the BOP to vaccinate all

12   staff and inmates.  While the decision whether or not to receive a

13   vaccine is left to each staff member and prisoner,[9] the effectiveness

14   of the vaccine program obviously will greatly increase as a larger

15   number of staff and inmates are vaccinated.  But allowing defendants

16   to claim that they have an "extraordinary and compelling" basis for

17   release despite refusing the vaccine will give them a significant

18   reason to forego the vaccine and take their chances regarding COVID-

19   19.

20        Defendant's circumstances are--in the present pandemic--far

21   closer to ordinary than "extraordinary."  His motion must be denied.

22        **B.   Even If Defendant Were Otherwise Eligible, the 18 U.S.C.
          § 3553(a) Factors Do Not Support a Shorter Sentence**

23

24        Any compassionate-release decision--even for a statutorily

25   eligible defendant--must also consider the factors under 18 U.S.C.

26   § 3553(a).  See 18 U.S.C. § 3582(c)(1)(A)(i).  Those factors--which

27

28        [9] The government is currently unaware of defendant's reason for
     refusing the vaccine.

                                    20

1    the sentencing court already considered when imposing defendant's

2    life sentence--do not support his request for premature, permanent

3    release.  They support his original sentence.

4            1.   <u>Defendant has not established that he is not a danger</u>

                 <u>to the community</u>

5

6      "Danger to the safety of other persons or the community" is no

7    longer is a separate statutory requirement for compassionate-release

8    eligibility because USSG § 1B1.13 no longer is binding.  <u>See</u> <u>Aruda</u>,

9    WL 1307884 at *4.  Nonetheless, the Court still must consider danger

10   because it is one of the listed § 3553(a) factors and the government

11   urges the Court to exercise its discretion to give great weight to

12   defendant's failure to establish that he is not a danger under the

13   criteria identified in 18 U.S.C. § 3142(g).  18 U.S.C.

14   § 3553(a)(2)(C) ("to protect the public from further crimes of the

15   defendant").

16      Courts routinely have denied motions by defendants who have not

17   made this showing.  <u>See</u> <u>United States v. Dancy</u>, EDCR 19-101-PA, ECF

18   No. 76, at 4 (C.D. Cal. August 18, 2020) (defendant has ten criminal

19   history points and remains a danger despite his medical ailments);

20   <u>accord</u> <u>United States v. Gotti</u>, 433 F. Supp. 3d 613, 619-20 (S.D.N.Y.

21   2020) (release was inappropriate regardless of extraordinary and

22   compelling circumstances; defendant posed a continuing danger to the

23   public); <u>United States v. Applewhite</u>, No. 08-CR-60037, 2020 WL

24   137452, at *2 (D. Or. Jan. 13, 2020) (denying compassionate release

25   for seriously ill 80-year-old inmate based on danger); <u>United States</u>

26   <u>v. Urso</u>, No. 03-CR-1382, 2019 WL 5423431, at *3 (E.D.N.Y. Oct. 23,

27   2019) (defendant remains a danger based on the serious nature of his

28   criminal conduct).

The record here precludes any such finding.  To the contrary, defendant poses a danger to the community.  Defendant's criminal history category was IV and his offense level for the instant offense was 42.  (ECF No. 863 at 198.)  Defendant was convicted of, among other things, being the leader and organizer of a substantial PCP manufacturing and distribution scheme.  He had been convicted of a prior drug crime for possession of PCP for sale before he committed the instant drug-related offense.  (PSR § 113.)

Defendant also has a history of possessing dangerous weapons (various guns, including a machine gun with an obliterated serial number, two rifles, two pistols, a revolver, and a loaded magazine).  (Id. §§ 123, 124.)  Defendant was convicted in January 1996 for felon in possession of a firearm.  (Id. ¶ 120.)  The danger defendant poses is not merely theoretical.  He was convicted of armed robbery in December 1980, and received a firearm enhancement in connection with that armed robbery.  (Id. ¶¶ 108-10.)

Finally, defendant's age and purported rehabilitation alone do not satisfy his burden.  The standard for compassionate release is not just whether someone is now older and has performed well in prison.  To the contrary, "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  USSG § 1B1.13, comment. (n.3).  Even being a "model inmate" does not warrant an "abrupt departure from [a defendant's] current sentence."  Applewhite, 2020 WL 137452, at *2.  Moreover, because there is a significant difference between doing well in prison and doing well in society, this Court, in evaluating the danger posed by defendant, cannot ignore the nature and circumstances of the offense,

defendant's ties to the community, and his criminal history.  18

U.S.C. § 3142(g).  An examination of those factors weighs against

early release.

    2. <u>The other § 3553(a) factors also weigh against release</u>

  <u>First</u>, the facts of the case do not merit a reduction of

defendant's sentence.  The sentencing court determined that

defendant's offense level was 42 and criminal history category was

IV.  His Sentencing Guidelines range was 360 months to life.  Based

on defendant's conviction under 21 U.S.C. § 848, the Court imposed a

mandatory life sentence.  (ECF No. 863 at 198.)  For the other

offenses, the Court imposed 360 months (<u>id.</u> at 196), and 10 years on

Counts 5 through 10 (21 U.S.C. §§ 841(d)(1)-(2); 18 U.S.C. § 2(a)),

all to be served concurrently.  (<u>Id.</u> at 196.)

  Defendant challenged his 21 U.S.C. § 848 conviction and

mandatory life sentence on appeal on the grounds that three of the

twelve people listed in the indictment were merely customers and

therefore, as a matter of law, could not have been among the five

persons he organized, supervised, or managed.  <u>United States v.

Broomfield</u>, 1998 WL 551971, at *3 (9th Cir. 1998).  The Ninth Circuit

rejected this argument and affirmed defendant's conviction.  <u>Id.</u> at

*4.

  <u>Second</u>, it bears emphasis that defendant's health condition is

not itself dire--as his own medical and prison records reflect.  (<u>See</u>

Exs. C, D.)  While defendant suffers from several ailments, including

back, foot, and pain in other extremities (<u>see id.</u>), they do not

appear to make defendant at greater risk for developing a serious

illness from any COVID-19 infection.  Further defendant has declined

to receive a vaccine, which greatly undermines any potential claim

23

that a fear of infection requires immediate release and reduction in defendant's sentence.

At bottom, granting compassionate release would undermine the 18 U.S.C. § 3553(a) factors, resulting in an effective sentence of 26 years, below the mandatory minimum.  The law, and the specific facts of defendant's case, neither demand nor endorse that result.

**V.   CONCLUSION**

The Court should deny the motion for the reasons set forth above.

Finally, the government requests that, if this Court ultimately grants relief, the government be given an opportunity to brief appropriate conditions--including a release plan, a mandatory quarantine, and a period of home confinement as a condition of supervised release.  See 18 U.S.C. § 3582(c)(1)(A).